IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 14, 2015

## RICHARD BLANCHARD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 17432     Robert Crigler, Judge**

_____

**No. M2014-00112-CCA-R3-PC - Filed February 18, 2015**

_____

The Petitioner, Richard Blanchard, was convicted of aggravated robbery, and the trial court sentenced him to an eleven-year sentence. This Court affirmed his conviction and sentence on appeal. *State v. Richard Lowell Blanchard*, No. M2010-1186-CCA-R3-CD, 2011 WL 2533753, at *1 (Tenn. Crim. App., at Nashville, June 24, 2011), *perm. app. denied* (Tenn. June 12, 2013). The Petitioner filed a petition seeking post-conviction relief, and, after a hearing, the post-conviction court denied the Petitioner relief. The Petitioner now appeals, maintaining that he received the ineffective assistance of counsel. After a review of the record, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Christopher P. Westmoreland, Shelbyville, Tennessee, for the appellant, Richard Blanchard.

Herbert H. Slatery, III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Robert J. Carter, District Attorney General; and Richard A. Cawley, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

A Bedford County jury convicted the Petitioner of aggravated robbery. On direct appeal, this Court summarized the facts presented at trial as follows:

In the early morning hours of March 8, 2009, Frank Dickerson was working the night shift at the Kangaroo Express gas station and market in Shelbyville, Tennessee, when an individual, later identified as the [Petitioner], entered the market. The [Petitioner] walked toward the beer cooler, but he then came around the counter to an area restricted to employees only. Mr. Dickerson pushed the [Petitioner] away. The [Petitioner] approached the counter area again, pulled a knife from behind his back, and told Mr. Dickerson to open the cash register drawer. Mr. Dickerson backed away from the [Petitioner], activated the silent alarm, and opened the drawer. The [Petitioner] took money totaling less than $90 from the drawer and attempted to leave quickly. Mr. Dickerson became "a little angry," grabbed a can of beer from the counter, and "flung it at" the [Petitioner]. The beer can hit the [Petitioner] as he fled. The police arrived approximately two to three minutes later.

Mr. Dickerson recognized the [Petitioner] as a customer but added that the [Petitioner] was not a "regular." Mr. Dickerson went to the police station later, where he immediately identified the [Petitioner] from a photographic array presented to him by Detective Brian Crews of the Shelbyville Police Department (SPD).

Mr. Dickerson described the knife as a large, open, lock-blade knife. When asked if he was fearful of the [Petitioner], Mr. Dickerson replied, "If you open a knife, yes, I think you might hurt me." He added that he "was afraid that [the [Petitioner]] might cut [him] if [he] didn't comply with what [the Petitioner] wanted."

SPD Officer Sam Jacobs responded to the call of a robbery at the Kangaroo Express market on March 8, 2009. When he arrived, he spoke to Mr. Dickerson who described the perpetrator as clean shaven with short brown hair wearing a black t-shirt and blue jeans.

Karen Wells, a store manager of the market, retrieved the surveillance video, copied it, and provided a copy to the police.

SPD Detective Brian Crews received the surveillance video from Ms. Wells. The video, played for the jury at trial, shows a man wearing hiking boots walking into the market. Detective Crews testified that when he watched the video, he recognized the assailant as "someone that [he] knew," the [Petitioner], and assembled a photographic array containing the

[Petitioner]'s photograph. When presented the photographic lineup, Mr. Dickerson immediately identified the [Petitioner] as the perpetrator.

Based upon this identification, Detective Crews determined the [Petitioner]'s whereabouts and obtained an arrest warrant. The [Petitioner] was arrested on the front porch of a house where he was staying. Wearing only a pair of shorts when arrested, the [Petitioner] asked Detective Crews to get his shoes and t-shirt from inside the house. After returning to the police station, Detective Crews realized the shoes that he had retrieved from the house "were the same shoes that [the perpetrator] was wearing at the time of the robbery" as could be seen in the video. Detective Crews recalled that the [Petitioner], who was "somewhat intoxicated" and "not very cooperative" at his arrest, did not make a statement. Investigators did not search the house where the [Petitioner] was arrested, and they did not find the lock-blade knife.

The [Petitioner] testified that he was a veteran of the United States Marine Corps and the French Foreign Legion. He spent two years employed as a trooper for the Florida Highway Patrol until he was forced to resign after a confrontation with another trooper who had had an affair with the [Petitioner]'s then wife. The [Petitioner] also claimed to have spent four years working as a contractor in Iraq for the Department of Defense until he, along with 16 other contractors, was asked to leave Iraq. The [Petitioner] denied owning a knife, and he also denied that the surveillance video showed him at the Kangaroo Express market. He said that he was in a hotel room at the Bedford Inn at the time of the offense. He did not, however, produce a hotel receipt at trial to substantiate his alibi.

Based upon this evidence, the jury convicted the Petitioner, and the trial court sentenced him to eleven years in prison. The conviction and sentence were affirmed on appeal. *See Blanchard*, 2011 WL 2533753, at *1.

## B. Post-Conviction Hearing

At the post-conviction hearing the parties presented the following evidence: the Petitioner's court-appointed attorney ("Counsel") testified that he represented the Petitioner on the aggravated robbery charge. As to his representation of the Petitioner, Counsel explained that, at the time, he worked at the Public Defender's Office. He explained that the attorneys in the Public Defender's Office "all kind of work[ed] together on cases, but I was the one that did the bulk of the work on [the Petitioner's case]." Counsel said that, in preparation for trial, he met with the Petitioner "numerous times" at both the jail and in court.

Counsel testified about discussions with the Petitioner on possible defenses. The Petitioner identified Shane Hargrove as a possible alibi witness. Counsel stated that his office attempted to locate Mr. Hargrove, but was unable to do so. He said that he conveyed the information about the potential alibi witness to the Petitioner's subsequent attorney ("Counsel II").

Counsel testified that the Petitioner was homeless at the time of the offense, and he did not recall the Petitioner telling Counsel that he was staying at a hotel at the time. When asked whether he spoke with the owner of the hotel about the "key card system" that might have established the Petitioner's presence at the hotel at the time of the offense, Counsel stated "I don't recall that. We might have done something on that, but I can't say for sure." Counsel identified notes between two investigators from his office. The investigator documented that he spoke with the manager of the Bedford Inn, Pat Patel, and learned that the Petitioner checked into the hotel on March 2, 2009. The Petitioner paid for "all week" and had a check out time of 11:00 a.m. on March 9, 2009. Mr. Patel was unaware of when the Petitioner actually moved out because the room was vacated when checked on March 9. Counsel's notes indicated that Mr. Patel "ha[d] no memory" of the Petitioner obtaining an electronic key at any time during his stay other than when he checked in on March 2. Counsel stated that he did not recall the Petitioner telling him about the Petitioner's cellular telephone that had a GPS tracking device.

Counsel testified that the "big issues" for the Petitioner were the surveillance video footage of the robbery, "the boots," and the potential alibi witness, Shane Hargrove. Counsel said that the Petitioner wanted evidence about his boots suppressed. Counsel described the evidence about the boots by stating that, at the time of the Petitioner's arrest, he was wearing only shorts and asked Detective Crews to retrieve shoes and a shirt from inside the house for him. Detective Crews did so and later commented that the boots he retrieved from inside the place where the Petitioner was staying looked like the boots that the suspect was wearing in the surveillance video of the robbery. Counsel said that he saw no grounds to suppress the boots because the Petitioner had asked Detective Crews to retrieve a pair of shoes and a shirt from his room. Counsel stated that he was unaware of when the Petitioner had purchased the boots and whether the purchase was before or after the robbery. Further, he said that he and the Petitioner never discussed the purchase date of the boots.

Counsel testified that the Petitioner believed that there was exculpatory evidence in the interrogation video. Counsel reviewed the video and did not believe it would benefit the Petitioner for the jury to see the video. He explained that, during the interrogation, the Petitioner made references to his probation sentence and past charges. Further, the Petitioner made threats during the interrogation, which Counsel thought was an exhibition of a

propensity to violence. Counsel stated that he did not recall that there was a visible injury to the Petitioner's head in the interrogation video footage.

Counsel testified that a Crime Stoppers video was released to the media showing footage of the robbery. Before Counsel received discovery for this case, he accessed the Crime Stoppers video from the Shelbyville Times-Gazette web page. He stated that, after viewing the video, the person in the footage "appeared to be [the Petitioner.]"

Counsel testified that he withdrew as counsel due to the Petitioner making threats against him and that the trial court appointed Counsel II in his place.

On cross-examination, Counsel testified that he discussed the charge, elements of the offense, possible defenses, and the range of punishment with the Petitioner. He stated that he reviewed the discovery with the Petitioner, which included the store clerk identification of the Petitioner in a photographic line-up, surveillance video footage from the store of the robbery, the boots recovered from the Petitioner's room, and the Petitioner's statements to the police. Counsel stated that he conveyed all plea offers to the Petitioner, and the Petitioner rejected all the plea offers, maintaining throughout the representation that he wanted to proceed to trial. Counsel confirmed that the Petitioner appeared to understand the offense and the proof needed to establish his guilt as to the offense.

Counsel II testified that the trial court appointed him to represent the Petitioner on the aggravated robbery charge after Counsel withdrew from representation. Counsel II stated that he spoke with Counsel about the case and the issue of Detective Crews identifying the Petitioner's boots as looking like the ones the suspect wore in the surveillance video. Counsel II said that he filed a motion to suppress information about identification of the boots. Counsel II stated that he challenged whether there was permission from the home owner given to the police to allow the officers to enter the house to retrieve shoes and a shirt for the Petitioner. The trial court held an evidentiary hearing on the matter, and Detective Crews testified that he retrieved the items at the Petitioner's request. The trial court denied the Petitioner's motion to suppress.

Counsel II testified that he spoke with Mr. Patel, the hotel manager where the Petitioner had been staying. Counsel II asked Mr. Patel about whether there was a way to retrieve "historical information" from the "key card machine." Mr. Patel said he did not know if information could be retrieved from the machine used to assign rooms to key cards but provided the name of the manufacturer and the model number. Counsel II conducted some research on the system but was unable to ascertain how to retrieve any information from the key card machine.

Counsel II testified that he did "follow up on the cell phone information" but was unable to "develop" information that was useful. He explained that it was "pretty common" for "these cell phone companies" to "dump records pretty quickly." He said that the time had passed in which he could have gathered any information from the cell phone company.

Counsel II testified that he watched the surveillance video of the robbery and stated that he was unable to recognize the suspect as the Petitioner. Counsel II filed a motion in limine asking the trial court to preclude Detective Crews from identifying the Petitioner on the video, and the trial court granted the request. Nonetheless, Detective Crews testified at trial that he believed the suspect in the surveillance video was the Petitioner. Counsel II said that he objected to the testimony and moved for a mistrial based upon Detective Crews's identification.

Counsel II testified that, at the time of his appointment to the case, he had less than two weeks until the trial. Counsel II stated that he could not recall if he requested a continuance, but that he would have only made that motion if he believed he was not ready for the trial. Counsel II identified his signature on the Bedford County Jail visitor sign-in book. Based on the entries, he estimated that he met with the Petitioner for about 4 ½ hours at the jail. He stated that he additionally met with the Petitioner at court appearances. Counsel II acknowledged that it was a short period of time between his appointment to the case and the trial, but stated, "I felt prepared coming into trial."

On cross-examination, Counsel II stated that he had been practicing over twenty years in Middle Tennessee and currently his case load was completely criminal defense work. Counsel II said that he had handled two dozen capital cases during his career. Counsel II stated that, even though there was a short period of time to prepare for trial, he had the benefit of the work done by the Public Defender's Office. Counsel II, referencing his claim for an attorney's fee, summarized his work on the case, which included meeting with the Public Defender's Office, meeting with the client, meeting with the assistant district attorney, drafting and filing subpoenas, investigation work, interviewing potential witnesses, drafting motions, pretrial hearing, drafting letters, trial preparation, and research time. Counsel II confirmed that there were no "surprises" at trial. Counsel II testified that he worked on the Petitioner's case for 8.8 hours in court and 42.4 hours outside of court.

After hearing the evidence, the post-conviction court issued an order denying relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court improperly denied his petition

seeking post conviction relief. He maintains on appeal that Counsel failed to investigate the Petitioner's alibi and failed to secure evidence to establish an alibi. The State responds that the Petitioner has not adequately demonstrated that he is entitled to relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine

whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In its order denying relief, the post-conviction court noted that this case, although serious, was not a complicated case. The evidence against the Petitioner was a surveillance video of the robbery and the store clerk's testimony that the Petitioner committed the crime. In considering the preparation for the trial, the post-conviction court stated it could not identify anything that should have been done to prepare for the trial that was not done. The

post-conviction court noted that the burden of proof was on the Petitioner to prove his allegations and that there was no proof that the key card system "would have indicated anything or what it would [have] indicat[ed]." In its written order, the post-conviction court concluded that the advice given and the services rendered were within the range of competence and any alleged deficiency did not affect the outcome of the trial.

We conclude that the post-conviction court's decision was supported by the evidence presented at the hearing. The record shows Counsel asked his investigator to investigate a possible alibi defense for the Petitioner. The investigator's notes reveal that he spoke with Pat Patel, the hotel manager, who said that the Petitioner checked into the hotel on March 2, 2009 and checked out on March 9, 2009. Mr. Patel did not recall that the Petitioner ever had an electronic key card. This evidence shows that attempts were made to obtain any records to establish an alibi, but such records did not exist. Further, the Petitioner did not offer any proof at the hearing that such evidence existed or was exculpatory. "When a [defendant] contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the [defendant] at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). If he fails to do so, he generally fails to establish ineffective assistance of counsel. *Id*. The reviewing court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Id*.; *see also  Wade v. State*, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995). Thus, we conclude that the Defendant failed to demonstrate that Counsel was ineffective in this respect.

Moreover, the evidence that the Petitioner did present at the hearing showed that Mr. Patel did not know if information could be obtained from the key card machine. Counsel II obtained information about the machine in order to determine if the machine collected useful information and, if so, how to obtain the information. Counsel II, through his research, was unable to obtain information about how to retrieve such information if it even existed. Therefore, the evidence at the hearing did not support the Petitioner's theory that Counsel was ineffective and that, but for Counsel's error, the fact finder would have had reasonable doubt regarding the Petitioner's guilt. *See Strickland*, 466 U.S. at 694-5.

Thus, we conclude that the Petitioner failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to show the first prong of the *Strickland* standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id*. He is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the

post-conviction court properly denied post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.


_____
ROBERT W. WEDEMEYER, JUDGE